# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

SAMANTHA ANNE HEIGES,                          Civil No. 12-2874 (JNE/TNL)

     Petitioner,

  v.                                          **REPORT AND RECOMMENDATION**

TOM ROY, Commissioner of Corrections,

     Respondent.

---

    Deborah Ellis and Susan Lynn Johnson, Ellis Law Office, 101 East Fifth Street, Suite 2626, Saint Paul, Minnesota, 55101, and Jennifer Macaulay, Macaulay Law Offices, Ltd., 649 Grand Avenue, Saint Paul, Minnesota, 55015, for Petitioner.

    Scott A. Hersey, Assistant Dakota County Attorney, 1560 Highway 55, Hastings, Minnesota, 55033, for Respondent.

---

TONY N. LEUNG, United States Magistrate Judge

    This matter is before the undersigned Magistrate Judge of the District Court on the petition of Samantha Anne Heiges ("Petitioner") for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent has filed an answer as well as a separate motion to dismiss "on the ground that petitioner has failed to exhaust state remedies."  (Docket Nos. 7 and 8.)  The issues have been fully briefed by the parties (Docket Nos. 4, 9-22, 24), and the case has been referred to this Court for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1.[1]  For the reasons discussed below, the Court will recommend that Respondent's motion to dismiss be **DENIED**, that Petitioner's habeas corpus petition be **DENIED**, and that this action be **DISMISSED WITH PREJUDICE**.

---

[1]  This case was initially referred to U.S. Magistrate Judge Jeanne J. Graham and later referred to the undersigned.  (Docket No. 26.)

## I. BACKGROUND

Petitioner is an inmate at the Minnesota Correctional Facility in Shakopee, Minnesota. She is serving a 299-month prison sentence, which was imposed in January 2009 in the state district court in Dakota County, Minnesota. Petitioner was sentenced after a Dakota County jury found her guilty of second-degree murder for killing her newborn daughter on or about May 5, 2005.

The police began to investigate the crime at issue in this case after receiving a report from a man identified as A.B.[2] A.B. told the police, and later testified at Petitioner's criminal trial, that he had been dating Petitioner during the fall of 2006 and went to visit her shortly after midnight on January 1, 2007. When he arrived at Petitioner's apartment, he found that she had been drinking, but she did not appear to be substantially intoxicated.

While A.B. was at Petitioner's apartment, she began to cry uncontrollably. When A.B. asked Petitioner what was wrong, she explained that she had given birth to a baby girl some time in the past. A.B. assumed that the baby had been adopted by someone, and he suggested that perhaps Petitioner could visit her sometime. Petitioner then told A.B. that the baby was dead, and A.B. assumed that the baby had been aborted. Petitioner, however, told A.B. that "it wasn't an abortion; that she had actually physically killed it." (Trial Transcript, ["Tr."], p. 74.)

Petitioner explained to A.B. that she had been living with her boyfriend, Erik Matlock, and she had become pregnant by him. Matlock was angry about Petitioner's pregnancy,

_____

[2] Several of the witnesses involved in this case are identified in the record by their initials rather than their full names. The Court will follow the practice that has been adopted by the parties and by the Minnesota state appellate courts, and will identify these individuals by their initials.

and he made it clear that he did not want the child. (Id.) Petitioner told A.B. that Matlock said she must kill the baby, or else he would kill both her and the baby. (Id., p. 75.) Petitioner said she gave birth to a baby girl in the apartment she shared with Matlock, and she drowned the baby in the bathtub. (Id., pp. 74-75.) Petitioner told A.B. that she later put the baby's body down a garbage chute. (Id., p. 76.) A.B. believed that Petitioner was a "very truthful" person, and he believed her when she said that she killed her baby. (Id., pp. 84, 93.)

After hearing Petitioner's story, A.B. encouraged her to call the police, but Petitioner reacted "very negatively" to that suggestion, and she became upset and angry with A.B. (Id., p. 77.) When A.B. left Petitioner's apartment, he was concerned that she might try to harm herself, so he peeked in a window of her apartment to check on her. (Id., p. 82.) Later that morning, A.B. talked to his parents, and then decided to call the police. (Id., p. 78.) Before talking to the police, however, A.B. talked to Petitioner on the telephone. He reminded Petitioner of the story she had told him about killing her baby. Petitioner said she did not remember telling the story to A.B., but "[s]he validated it," and did not deny any of it. (Id., p. 79.) Later that day, A.B. went to the Burnsville Police Department and told Detective Jeff Pfaff the story that Petitioner had shared with him about killing her baby. (Id., p. 78.)

After hearing A.B.'s story, Pfaff began to investigate whether Petitioner had indeed murdered her baby. Pfaff interviewed Petitioner on at least four occasions during 2007. During the first interview, on January 30, 2007, Petitioner acknowledged that she had been pregnant by Matlock and had delivered a baby. Petitioner initially told Pfaff that the baby

"wasn't alive." (Pfaff Interview Transcripts, pp. 4, 9.[3]) Later, however, Petitioner explained that she delivered a baby in the bathtub of her apartment, she named the baby "Sydney,"[4] and she tried to hold the baby after she was born.  Matlock, however, was present when Sydney was born and would not let Petitioner hold her.  Petitioner said that Matlock told her to hold the baby under the water.  Petitioner indicated that Matlock had given her an ultimatum to get rid of the baby, or else he would get rid of Petitioner.  (Id., pp. 11-13.)  At that point, Petitioner candidly acknowledged that Sydney had been born alive, but that Matlock would not let her take Sydney out of the water.  (Id., pp. 14-15.)  Petitioner indicated that Sydney struggled a little bit as she was held under the water, and it was painful to watch her die.  (Id., pp. 33-34.)  After Sydney died, Matlock cleaned up the bathtub, and Petitioner went into her room and cried.  (Id., pp. 34, 36.)  Petitioner told Pfaff that she wrapped Sydney's body in a towel and put it in a shoebox.  Sometime later, Matlock put the box in a plastic bag, and they put the bag down the garbage chute.  (Id., pp. 34-35; see also id. pp. 79-81.)[5]

---

[3]  The transcripts of Pfaff's four interviews with Petitioner have been filed in the present record as Docket No. 10.  Each transcript is labeled as an "Exhibit," and Respondent has referred to them as "Court Exhibits." (Respondent's Memorandum, [Docket No. 9], p. 9.)  The Clerk of Court has used a single set of numbers to identify all of the pages of the four transcripts, (pages 1-93), and the Court will refer to the transcripts by using the Clerk's pagination.

[4]  Pfaff initially was confused about the baby's name, and referred to her as "Cindy," but Petitioner corrected Pfaff and confirmed that she had named her baby "Sydney." (See Respondent's Memorandum, [Docket No. 9], pp. 6, 9 and 11; see also Pfaff Interview Transcripts, [Docket No. 10], pp. 4, 5, 10 and 12.)

[5]  The police explored the possibility of trying to locate Sydney's body in the landfill where it would have been deposited by the disposal company that picked up the trash at Petitioner's apartment.  The police concluded, however, that any such effort to locate the body would have been futile.

In a subsequent interview, Pfaff told Petitioner that he had talked to Matlock. According to Pfaff, Matlock claimed that he never saw the baby, but Matlock did describe an occasion, after Petitioner was no longer pregnant, when he found Petitioner in the bathtub with cuts on her wrists. (Id., p. 54.) Petitioner acknowledged that she had cut her wrists, and that she had started to write the name "Sydney" on the wall (apparently with her own blood). (Id.) Petitioner told Pfaff she "thought it was unfair she had to die there." (Id.)

In a subsequent interview, Petitioner told Pfaff that Matlock put a sock in her mouth while she was in the tub delivering Sydney to muffle any noise that the neighbors might otherwise hear. (Id., pp. 73-74.) Petitioner explained that Matlock was sitting on the toilet next to the tub when the baby was born. She said she tried to pick the baby up out of the water, but Matlock told her she had to keep the baby under the water, and he watched Petitioner to make sure that she did not bring the baby up out of the water. (Id., pp. 74-75.) When Pfaff suggested that the baby must have struggled and gasped for air, Petitioner did not contradict him. (Id., pp. 75-76.)

A few months after that interview, Petitioner was charged with second-degree murder without premeditation and first-degree manslaughter. The criminal complaint alleged that Petitioner delivered a baby girl and killed her on May 5, 2005.

One of the State's witnesses at Petitioner's trial was a woman identified as R.C. R.C. met Petitioner in the fall of 2004, while they both were attending classes at Argosy University. (Tr. p. 678.) Petitioner told R.C. that she was pregnant, but she wanted to keep it a secret. (Id., pp. 680-81.) She also told R.C. that "they were trying to get rid of the baby, so she wasn't telling anybody" about the pregnancy. (Id., pp. 681-82.) Petitioner told R.C. that she had been "drinking and using drugs to abort" the baby, but "it didn't work."

5

(Id., p. 682.)  Petitioner then revealed that she and her boyfriend (Matlock) had formed a plan to "deliver the baby up north at a cabin somewhere and then kill it and bury it in the woods."  (Id.)  After R.C. heard about that plan, she contacted a social worker and the police for the City of Eagan, Minnesota.  (Id., pp. 683-84.)

Around the middle of May of 2005, Petitioner called R.C.  (Id.,  p. 685.)  Petitioner was crying, and said "she had had the baby and she couldn't find it."  (Id.)  Petitioner then explained to R.C. that "they had the baby in the bathtub and drowned it, and then she kept it in a shoe box."  (Id., p. 686; see also id., p. 705 ("She told me they drowned it.").)  Petitioner "assumed that her boyfriend came home and found it and got rid of it."  (Id., p. 686.)  R.C. testified that Petitioner said she "held the baby," and that Petitioner was "very upset" during their telephone conversation.  (Id., pp. 686-87.)  R.C. testified that Petitioner told her the baby was "born alive" and that "they killed the baby."  (Id., pp. 708, 709; see also id., p. 710 ("She said it about seven times, so she went 'they killed the baby,' 'I killed the baby' – I don't know....  She was hysterical.").)[6]

A Dakota County jury found Petitioner guilty of second-degree murder for killing her newborn baby, and she was sentenced to 299 months in prison.  After Petitioner was convicted and sentenced, she filed an appeal with the Minnesota Court of Appeals. Petitioner raised several legal challenges in her direct appeal, but all of them were rejected on the merits, and her conviction and sentence were upheld (with one of three judges

---

[6]  After R.C. talked with Petitioner on the phone, R.C. called the Eagan Police Department again (Tr., p. 687).  R.C.'s story about Petitioner, however, apparently remained unknown to Detective Pfaff and the Burnsville Police Department (who were investigating A.B.'s story about Petitioner) until Petitioner's trial was underway.  See supra n. 4.

dissenting).  State v. Heiges, 779 N.W.2d 904 (Minn. App. 2010).

Petitioner then sought further review in the Minnesota Supreme Court, and her petition for review was granted "on the issues of whether petitioner's conviction violates Minn. Stat. § 634.03 (2008) and whether there was sufficient evidence to sustain petitioner's conviction."[7]  The Minnesota Supreme Court unanimously affirmed Petitioner's conviction and sentence.  State v. Heiges, 806 N.W.2d 1 (Minn. 2011).

After Petitioner's direct appeal was completed, she filed her present petition for a writ of habeas corpus under 28 U.S.C. § 2254.  The petition lists a single ground for relief, which is stated as follows:

> Whether petitioner's conviction for murder in a no-body neonaticide case violated the Fourteenth Amendment Due Process Clause where evidence of corpus delicti fell short of proof beyond a reasonable doubt.  Petitioner's issues are raised under Jackson v. Virginia, 443 U.S. 307 (1979), and In Re Winship, 397 U.S. 358 (1970).

(Petition, (Docket No. 1), p. 6, § 12.)  (Jackson and Winship address, among other matters, whether the evidence presented to a jury was constitutionally sufficient to support a conviction.)

## II.  MOTION TO DISMISS FOR FAILURE TO EXHAUST STATE REMEDIES

Respondent has filed a motion asking the Court to dismiss summarily Petitioner's habeas corpus petition without reaching the merits of her insufficiency-of-the-evidence claim.  Respondent contends that Petitioner has failed to exhaust her state court remedies for her current habeas corpus claim because she did not fairly present that claim to the Minnesota Supreme Court before raising it here.

---

[7]  A copy of the order granting the petition for review is attached to Respondent's Memorandum.  (Docket No. 9.)

It is well settled that federal courts normally will not entertain a habeas corpus claim raised by a state prisoner unless the claim has already been fairly raised and addressed on the merits in the highest available state court.  28 U.S.C. § 2254(b);  O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); Rose v. Lundy, 455 U.S. 509 (1982).  The United States Supreme Court has explained this requirement as follows:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights.' To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim.

Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citations omitted); see also O'Sullivan, 526 U.S. at 845 ("Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts,... state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.").

A state prisoner seeking federal habeas relief is not required to have spelled out every nuance of his federal constitutional claims to the state courts, but he does have to give the state courts fair notice that there is indeed a federal constitutional dimension to his claims.  "If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."  Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam).

Here, Respondent contends that Petitioner did not fairly apprise the Minnesota

Supreme Court that she was challenging her conviction on <u>federal constitutional grounds</u>.

According to Respondent, the arguments that Petitioner raised in the state courts were

based solely on "state common law and statutory underpinnings," and "she did not develop

the arguments concerning federal constitutional law, or give the Minnesota Supreme Court

a full and fair opportunity to address the specific issues under federal constitutional or

statutory law." (Respondent's Memorandum, (Docket No. 9), pp. 19, 20.) "Even more

importantly," Respondent argues, "the Minnesota Supreme Court did not analyze or rule

on any issue of federal constitutional or statutory law in its opinion." (<u>Id.</u>, p. 20.)

Respondent's failure-to-exhaust argument is rejected.[8]

Petitioner's brief to the Minnesota Supreme Court plainly asserts that "[c]riminal

---

[8] If there is still a state court remedy available, a previously unraised habeas claim is merely "unexhausted," and the petition should be dismissed <u>without prejudice</u> so the petitioner can return to the state courts and satisfy the exhaustion requirement. However, if there is no state court remedy still available for a claim that was not previously raised in the state courts, then that claim is "procedurally defaulted" for federal habeas purposes, and the claim should (normally) be dismissed <u>with prejudice</u>. <u>See</u> <u>Armstrong v. Iowa</u>, 418 F.3d 924, 926 (8th Cir. 2005), <u>cert</u>. <u>denied</u>, 546 U.S. 1179 (2006) ("[w]hen a state court remedy is available for a state prisoner's unexhausted claim, the federal habeas court must defer action until the claim is exhausted, either by dismissing the federal petition without prejudice or by using the 'stay and abeyance' procedure... [but] if no state court remedy is available for the unexhausted claim – that is, if resort to the state courts would be futile – then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim...'" (quoting <u>Gray v. Netherland</u>, 518 U.S. 152, 162 (1996))). Here, Respondent is somewhat unclear about whether Petitioner's current constitutional claim is "merely unexhausted," and it should therefore be dismissed without prejudice so she can return to the state courts and exhaust her still-available state court remedies, or whether the claim is "procedurally defaulted," and it should therefore be dismissed with prejudice because no available state court remedy still exists. (<u>See</u> Respondent's Memorandum, pp. 21-23.) Because the Court finds that Petitioner's current constitutional claim <u>was</u> fairly presented to the Minnesota Supreme Court, and thus it <u>is</u> exhausted, it will be not be necessary to untangle Respondent's failure-to-exhaust argument.

defendants have a due process right to have their convictions supported by evidence that leaves no reasonable doubt about their guilt." (Appellant's Brief to the Minnesota Supreme Court, (Docket No. 14), p. 35 (emphasis added).)  To support that assertion, Petitioner cited the Fifth and Fourteenth Amendments to the Constitution, as well as two  apposite decisions by the United States Supreme Court – Jackson and Winship.  (Id.) Petitioner did not discuss her federal constitutional claim in detail, but she did notify the Minnesota Supreme Court that she was raising such a claim.

Furthermore, it is evident that the Minnesota Supreme Court recognized that Petitioner was presenting an insufficiency-of-the-evidence claim based on the due process clause of the federal Constitution.  The order granting Petitioner's petition for review specifically indicated that the Minnesota Supreme Court would review the issue of "whether there was sufficient evidence to sustain petitioner's conviction."  (Order Granting Petition for Review, attached to Respondent's Memorandum (Docket No. 9).)  More importantly, the Minnesota Supreme Court specifically addressed Petitioner's insufficiency of the evidence claim in the decision that affirmed her conviction.  Heiges, 806 N.W.2d at 17. The Court said: "In considering the sufficiency of the evidence, our review is limited to a 'painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, is sufficient to allow the jurors to reach the verdict that they did."  Id. (quoting State v. Webb, 440 N.W.2d 426, 430 (Minn. 1989)). This standard of review recited by the Minnesota Supreme Court is substantially similar to the constitutional standard of review prescribed by the United States Supreme Court in Jackson.  See Jackson, 443 U.S. at 319 ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt."). The Minnesota Supreme Court's citation to Webb is also significant because Webb followed State v. Martin, 293 N.W.2d 54, 55 (Minn. 1980), and the ruling in Martin was based directly on Winship. See Martin, 293 N.W.2d at 55 ("The Fourteenth Amendment of the United States Constitution requires that the state prove every element of the offense beyond a reasonable doubt.") (quoting Winship, 397 U.S. at 364).

Thus, the Court finds that Petitioner's current federal constitutional claim – i.e., that she was denied due process because there was insufficient evidence to prove her guilt beyond a reasonable doubt – was fairly presented to the Minnesota Supreme Court. The Court further finds that the Minnesota Supreme Court considered and rejected that claim on the merits. Heiges, 806 N.W.2d at 17.[9] The Court will therefore recommend that Respondent's motion to dismiss summarily this case for non-exhaustion (or procedural default) should be denied, and Petitioner's current habeas corpus claim will be addressed on the merits.

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") prescribes the standards that govern this Court's substantive review of Petitioner's current habeas corpus claim. The relevant portion of AEDPA, 28 U.S.C. § 2254(d), provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with

---

[9] Petitioner suggests that, although she fairly presented her due process claim on direct appeal, the Minnesota Supreme Court did not actually decide that claim on the merits. (Petitioner's Memorandum, (Docket No. 4), p. 20.) That argument is rejected. The Minnesota Supreme Court did decide Petitioner's constitutional claim on the merits. Heiges, 806 N.W.2d at 17.

respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(Emphasis added.)

In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), the United States Supreme Court discussed the meaning of this statute, and how it should be applied by the federal district courts. The Supreme Court recognized that

> a state-court decision can be "contrary to" this Court's clearly established precedent in two ways. First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

<u>Id.</u> at 405. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413.

The Court also explained that

> A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was <u>objectively unreasonable</u>. . . . [¶] [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

Id. at 409, 411 (emphasis added).

A writ of habeas corpus may also be available where the state court's resolution of a prisoner's criminal case is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In other words, habeas relief can be granted if the conviction is based on findings of fact that could not reasonably be derived from the state court evidentiary record. When reviewing a state court decision, however, "a federal court . . . presumes that the state court's factual determinations are correct," and that presumption "may be rebutted only by clear and convincing evidence." Lee v. Gammon, 222 F.3d 441, 442 (8th Cir. 2000). Section 2254 provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

A federal district court is not allowed to conduct its own de novo review of a prisoner's constitutional claims. Yarborough v. Alvarado, 541 U.S. 652, 665 (2004) ("We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a de novo matter."). "AEDPA ... imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt'...." Renico v. Lett, 559 U.S. 766, 773 (2010) (citations omitted). Habeas relief cannot be granted unless the prisoner has identified, and substantiated, a specific error committed by the state courts. Moreover, she must show that the state courts committed the type of error that is actionable under § 2254(d) as that

13

statute has been interpreted by the Supreme Court in <u>Williams</u>.  The petitioner "must show

that the state court's ruling on the claim being presented in federal court was so lacking in

justification that there was an error well understood and comprehended in existing law

beyond any possibility for fairminded disagreement." <u>Harrington v. Richter</u>, 131 S.Ct. 770,

787 (2011).

With these principles in mind, the Court considers whether Petitioner is entitled to

a writ of habeas corpus on the insufficiency of the evidence claim presented in her current

petition.

## IV.  DISCUSSION

> The evidence is sufficient to support a conviction whenever, 'after viewing
> the evidence in the light most favorable to the prosecution, any rational trier
> of fact could have found the essential elements of the crime beyond a
> reasonable doubt.' <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  And a
> state-court decision rejecting a sufficiency challenge may not be overturned
> on federal habeas unless the 'decision was 'objectively unreasonable.'

<u>Parker v. Matthews</u>, 132 S.Ct. 2148, 2152 (2012) (quoting <u>Cavazos v. Smith</u>,132 S.Ct. 2,

4 (2011)).  The Supreme Court has characterized the applicable standard of review as

"twice-deferential," <u>Parker</u>, 132 S.Ct at 2152,  because (1) under <u>Jackson</u>, the state court

must be deferential to a jury's verdict when an insufficiency-of-the-evidence claim is

reviewed on direct appeal, and (2) under AEDPA, a federal court must be deferential to the

state court's resolution of an insufficiency-of-the-evidence claim in a § 2254 habeas corpus

proceeding.

In this case, the Minnesota Supreme Court properly acknowledged the deference

that must be given to the jury's verdict on direct appellate review.  <u>See Heiges</u>, 806 N.W.2d

at 17 (when reviewing an insufficiency-of-the-evidence claim, appellate court must

"'determine whether the evidence, when viewed in the light most favorable to the conviction, is sufficient to allow the jurors to reach the verdict that they did'") (citation omitted).  Applying the required deferential standard of review, the Minnesota Supreme Court concluded that the prosecution had presented sufficient evidence to support the jury's second-degree murder verdict.  Id.

A.    State Court Decision Not Objectively Unreasonable

Under AEDPA, this Court must now give the required measure of deference to the Minnesota Supreme Court's evaluation of Petitioner's insufficiency-of-the-evidence claim. "[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Cavazos, 132 S.Ct. at 4 (citing Renico, 559 U.S. at 773).  Applying the AEDPA standard of review, this Court cannot conclude that the Minnesota Supreme Court's resolution of Petitioner's insufficiency-of-the-evidence claim is contrary to, or involves an unreasonable application of, Jackson, Winship or any other decision of the United States Supreme Court.  Nor is the Minnesota Supreme Court's decision based on an objectively unreasonable determination of the facts.

Petitioner specifically contends that "the state had to prove that the baby was born alive," and that "[n]o such proof was offered or received."  (Petitioner's Memorandum, (Docket No. 4), p. 2.[10])  This argument is not sustainable because the prosecution presented evidence showing that Petitioner herself repeatedly said the baby was born

---

[10]   See also Petitioner's Memorandum, [Docket No. 4], p. 24 ("[t]here was no evidence presented... that an infant delivered by [Petitioner] was alive").

alive—in addition to other corroborating evidence.

The record shows that Petitioner told at least three different people, on three different occasions, that she gave birth to a daughter, her daughter was born alive, and she killed her daughter by forcing her to remain under water until she was dead.  Petitioner made this confession to her friend R.C. in May 2005 (see p. 6, supra); she made a nearly identical confession to her boyfriend A.B. on January 1, 2007 (see pp. 2-3, supra); and she later confessed again (more than once) to Detective Pfaff in several interviews starting January 30, 2007 (see pp. 3-5, supra).

Moreover, as the Minnesota Supreme Court discussed at some length, the prosecution presented substantial evidence to establish the trustworthiness of Petitioner's multiple confessions.  The State Court identified several specific pieces of evidence that enhanced the credibility of Petitioner's confessions to R.C., A.B. and Pfaff.  This evidence included the following:

(1) Petitioner's admission that she was pregnant was supported by (a) the testimony of her ex-boyfriend, Matlock, and (b) various witnesses who observed that Petitioner appeared to be gaining weight and wearing looser clothing prior to May of 2005 (when Sydney was born) and thereafter she appeared to lose weight.  Heiges, 806 N.W.2d at 13.

(2) R.C. testified that Petitioner had said, before Sydney was born, that she and Matlock were trying to cause a miscarriage, and they had discussed plans to "deliver the baby at a cabin in northern Minnesota, kill it, and bury it in the woods."  Id.

(3) Tests were performed on blood found in the bathroom of the apartment that Petitioner shared with Matlock, and a "forensic scientist testified that it was 'possible' that one of the contributors to the DNA mixture could have been a child of [Petitioner] and

Matlock." <u>Id.</u> at 14.

(4) Two of Petitioner's acquaintances testified that Matlock was abusive toward Petitioner, which was consistent with Petitioner's confessions.  <u>Id.</u>

(5) Matlock testified that Petitioner cut her wrists a few weeks after Sydney was born, which was consistent with Petitioner's statements to Pfaff, and also showed that Petitioner "felt severe regret and sadness." <u>Id.</u>

(6) Matlock testified that Petitioner told him "'[i]t's done... You didn't want the baby anyhow,'" which is consistent with Petitioner's admission that she killed Sydney. <u>Id.</u>

(7) A witness testified that there was a garbage chute in the apartment that Petitioner shared with Matlock, which is consistent with some of Petitioner's statements about the disposal of Sydney's body.  <u>Id.</u>

The Minnesota Supreme Court concluded "that there was sufficient corroborating evidence from which the jury could infer the trustworthiness of all three of Heiges's confessions." <u>Id.</u> at 14.[11]   The Minnesota Supreme Court went on to state: "When [Petitioner's] confessions are taken into account, there is sufficient evidence to support her conviction of second-degree murder." <u>Id.</u> at 17  This Court agrees.  Based on Petitioner's statements to R.C., A.B. and Pfaff at three different times and circumstances, and the collection of additional evidence supporting those statements, a jury could reasonably find that Petitioner was guilty of causing the death of a live human being – namely, her daughter, Sydney.

---

[11]  This Court independently notes that Petitioner's confessions to R.C. and  A.B. were not prompted by any type of suggestive interrogation.  Both of those confessions were entirely voluntary and spontaneous, which greatly enhances their credibility.

B.   Corroboration of Petitioner's Confessions Is Not Constitutionally Required by Clearly Established U.S. Supreme Court Authority

It appears that the true gist of Petitioner's habeas corpus claim is that there was insufficient independent evidence, separate and distinct from her confessions, to prove each element of second-degree murder.  (See Petitioner's Memorandum, (Docket No. 4), at 29 ("There is no corroborating evidence of a live human being other than [Petitioner's own] words") (emphasis added).)  Petitioner goes on to assert: "None of the evidence proffered by the State or considered by the Minnesota Courts meets the federal standard for sufficient evidence to corroborate a confession." Id. at 30.

Petitioner's argument fails for several reasons. First, as stated in the previous section of this Report and Recommendation, the Minnesota Supreme Court specifically reviewed, addressed and found sufficient the evidence supporting Petitioner's confessions. But, even if this Court were to assume solely for the purposes of argument that there was insufficient corroboration of Petitioner's confessions, Petitioner would still not prevail in this habeas petition.

The U.S. Supreme Court has never enunciated that the due process clause, or any other part of the Constitution, requires independent evidence to corroborate a criminal defendant's confession. To be sure, some Supreme Court cases hold that such corroboration is necessary in federal criminal cases, but the Supreme Court has not held that states are constitutionally required to enforce an independent corroboration rule.

In Wong Sun v. United States, 371 U.S. 471, 488-89 (1963), the Supreme Court explained that –

It is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the

18

uncorroborated admission or confession of the accused.... We observed in
Smith v. United States, 348 U.S. 147, 153... [1954] that the requirement of
corroboration is rooted in 'a long history of judicial experience with
confessions and in the realization that sound law enforcement requires police
investigations which extend beyond the words of the accused.' In Opper v.
United States, 348 U.S. 84, 89-90... [1954] we elaborated the reasons for the
requirement:

> 'In our country the doubt persists that the zeal of the agencies
> of prosecution to protect the peace, the self-interest of the
> accomplice, the maliciousness of an enemy or the aberration
> or weakness of the accused under the strain of suspicion may
> tinge or warp the facts of the confession. Admissions, retold
> at a trial, are much like hearsay, that is, statements not made
> at the pending trial. They had neither the compulsion of the
> oath nor the test of cross-examination.'

(Emphasis added.)

Smith, Opper and Wong Sun establish a federal common law rule – i.e., a "principle
of the administration of criminal justice in the federal courts" – that requires corroboration
of confessions by criminal defendants. But again, the Supreme Court has not declared
that rule to be an element of constitutional due process, and thus the Supreme Court has
not ruled that states are constitutionally required to apply the corroboration-of-confessions
rule discussed in Smith, Opper and Wong Sun.

Wong Sun makes no mention of the Fifth or Fourteenth Amendment, or the term
"due process." Likewise, "Opper and Smith made no reference to constitutional
compulsion; corroboration was merely deemed a better rule sanctioned by common law."
Tash v. Roden, 626 F.3d 15, 18 (1st Cir. 2010); see also Johnson v. Gibson, No. 99-7089
(10th Cir. 2000), 2000 WL 1158335, at *9 (unpublished opinion) ("Although Oklahoma law
relies on authority from federal criminal cases, petitioner fails to cite any clearly established
Supreme Court authority holding that the need for independent corroboration of a

defendant's confession is constitutionally required.") (emphasis added), <u>cert</u>. <u>denied</u>, 532 U.S. 945 (2001).  The Eighth Circuit Court of Appeals has expressly noted in one case that "[t]he corroboration rule has never been termed a constitutional requirement." <u>Aschmeller v. State of South Dakota</u>, 534 F.2d 830, 832, n.1 (8th Cir. 1976) (<u>per</u> <u>curiam</u>); <u>accord</u> <u>Bennett v. Ricci</u>, No. CIV. 06-3583 (JAP), 2007 WL 2444118, at *17 (D.N.J. Aug. 22, 2007) ("The corroboration rule is not constitutionally based. Thus, its alleged violation does not assert a violation of the Constitution, and this Court lacks jurisdiction to grant habeas relief.").[12]

Moreover, Minnesota – like many states and the federal courts – has adopted the rule, codifying it at Minn.Stat. § 634.03.[13] And on Petitioner's direct appeal, the Minnesota Supreme Court concluded that the evidence presented at trial was sufficient to satisfy the requirements of the statute. Petitioner undoubtedly believes that the Minnesota state courts did not properly apply this statute in her case.   But, it is well-settled that state court rulings on state laws are not reviewable in federal habeas corpus proceedings.  <u>See</u> <u>Wainwright</u>

---

[12]  While there is language in <u>Evans v. Luebbers</u>, 371 F.3d 438 (8th Cir. 2004), <u>cert</u>. <u>denied</u>, 543 U.S. 1067 (2005), to support that the holdings of <u>Wong Sun</u> and <u>Smith</u> were tied to the federal Constitution, <u>see id</u>. at 443 ("the clear constitutional rule announced in these decisions is the requirement that a defendant's conviction not rest solely upon his or her confession or extra-judicial statements"), Petitioner fails to cite clearly established <u>Supreme Court authority</u> that the need for independent corroboration of a defendant's confession on several occasions to several different people is constitutionally required.

[13]  Minn.Stat. § 634.03 states:

A confession of the defendant shall not be sufficient to warrant conviction without evidence that the offense charged has been committed; nor can it be given in evidence against the defendant whether made in the course of judicial proceedings or to a private person, when made under the influence of fear produced by threats.

v. Goode, 464 U.S. 78, 83 (1983) (per curiam) ("It is axiomatic that federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension."). Therefore, this Court has no authority to review the Minnesota Supreme Court's interpretation and application of Minnesota's corroboration-of-confessions rule – Minn.Stat. § 634.03. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); Evenstad v. Carlson, 470 F.3d 777, 782 (8th Cir. 2006) ("[l]ike the district court, we lack authority to review the Minnesota state courts' interpretation and application of state law").

A federal court can grant habeas corpus relief only if a state court has rendered a decision that is contrary to, or involves an unreasonable application of, a federal constitutional requirement established by the United States Supreme Court. "[I]t is not enough for [a state habeas petitioner] to argue the Minnesota state courts misapplied state law. To obtain habeas relief, [the petitioner] must be able to point to the Supreme Court precedent he thinks the Minnesota state courts acted contrary to or applied unreasonably." Evenstad, 470 F.3d at at 783. Petitioner has cited no decision of the United States Supreme Court that holds the corroboration-of-confessions rule is mandated by the federal Constitution. Therefore, Petitioner cannot be granted a writ of habeas corpus based on the state court's alleged misapplication of state law.

## V. CONCLUSION

In sum, Petitioner asked the Minnesota Supreme Court to vacate her conviction for second-degree murder because there was (she claimed) insufficient evidence to support the jury's verdict. The Minnesota Supreme Court correctly recognized that a jury's verdict

21

is entitled to substantial deference and should not be set aside if the evidence, when viewed in the light most favorable to the conviction, was "sufficient to allow the jurors to reach the verdict that they did." Heiges, 806 N.W.2d 806. The Minnesota Supreme Court rejected Petitioner's insufficiency-of-the-evidence claim based on a careful review of the evidence in the record.  The Minnesota Supreme Court pointed out that Petitioner made remarkably consistent confessions on three separate occasions.  She confessed to at least three people at three different times that she gave birth to a live daughter, and that she killed her daughter by holding her under water until the little girl died.  The confessions made to R.C., A.B. and Pfaff provide evidence of Petitioner's guilt.  The State Court also cited a substantial collection of additional evidence that bolstered the credibility of Petitioner's confessions.

This Court cannot overturn the State Court's decision on Petitioner's insufficiency-of-the-evidence claim unless she has satisfied the demanding standard imposed by 28 U.S.C. § 1915(d).  Petitioner has not met that burden.  She has not established that the Minnesota Supreme Court's ruling on her insufficiency-of-the-evidence claim is contrary to, or involves an unreasonable application of, a constitutional rule established by a decision of the United States Supreme Court.  Nor has Petitioner shown that the Minnesota Supreme Court's decision on her direct appeal is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Given the consistency and multiplicity of Petitioner's credible confessions, and the other evidence presented at trial corroborating the confessions, the jury's verdict was not unreasonable.  Therefore, applying the "twice-deferential" standard of review prescribed by Parker, 132 S.Ct. at 2152, the Court finds that Petitioner cannot be granted a writ of habeas corpus on the

22

insufficiency-of-the-evidence claim presented in her habeas corpus petition.

## VI.  CERTIFICATE OF APPEALABILITY

A § 2254 habeas corpus petitioner cannot appeal an adverse ruling on her petition unless she is granted a Certificate of Appealability, ("COA").  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).   A COA cannot be granted unless the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. Daniel, 529 U.S. 473, 484 (2000).

In this case, the Court finds that it is unlikely any other court, including the Eighth Circuit Court of Appeals, would decide Petitioner's current claim for relief any differently than it has been decided here.   Petitioner has not identified (and the Court cannot independently discern) any federal constitutional issue in this case that warrants appellate review.  It is therefore recommended that Petitioner should <u>not</u> be granted a COA in this matter.

## VII.  RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.  Respondent's motion to dismiss on the ground that Petitioner failed to exhaust her state court remedies (Docket No. 8) be **DENIED**;

2.  Petitioner's application for habeas corpus relief under 28 U.S.C. § 2254 (Docket No. 1) be **DENIED**;

3.  This action be **DISMISSED WITH PREJUDICE**; and

4.  Petitioner should **NOT** be granted a Certificate of Appealability.


Dated: January 22, 2014

      S/ Tony N. Leung
TONY N. LEUNG
United States Magistrate Judge


*Heiges v. Roy*
File No. 12-cv-2874 (JNE/TNL)


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **February 6, 2014.**